IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHRISTOPHER K. BLACKLOCK,

Petitioner,

v.                                                        CASE NO. 23-3253-JWL

DAN SCHNURR,

Respondent.

## MEMORANDUM AND ORDER

This matter is a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner and Kansas state prisoner Christopher K. Blacklock on November 29, 2023. (Doc. 1.) The matter comes before the Court on the threshold issue of whether the actual innocence exception to the federal habeas statute of limitations applies. The Court has carefully considered the arguments of both parties, the relevant state-court records, and the controlling law. For the reasons explained below, the Court concludes that the actual innocence exception does not apply and this matter must be dismissed as time-barred.

## Background

In 2010, Petitioner, Leshaun Curtis, Ziahdrick Williams, and Eric Blake Eakin drove from Texas to Iowa in two cars, transporting marijuana that was sold in Iowa. *State v. Blacklock*, 2014 WL 3731885, *1 (Kan. Ct. App. July 25, 2014) (unpublished opinion) (*Blacklock I*), *rev. denied* June 29, 2015. On the way back to Texas, "Williams drove one vehicle with [Petitioner] as his passenger, and Curtis drove the other vehicle with Eakin as his passenger." *Id.* While passing through Johnson County, Kansas, Petitioner stabbed Williams multiple times; their car stopped

1

after it hit a concrete barrier wall. *Id.* at *2. A highway patrol trooper stopped and saw Williams and then Petitioner get out of the car and run towards him. *Id.* Petitioner stated that he had stabbed Williams in self-defense because he thought that Curtis had killed Eakin and that Curtis and Williams intended to kill Petitioner the next time they stopped. *Id.* at *2-3, *6. Williams ultimately died from the stab wounds. *Id.* at *2.

A jury in Johnson County, Kansas convicted Petitioner of second-degree murder, possession of marijuana with intent to distribute, and possession of drug paraphernalia and he was sentenced to 311 months in prison. (Doc. 1, p. 1.) Petitioner pursued a direct appeal, but the Kansas Court of Appeals (KCOA) affirmed his convictions and sentences. *Id.* at 2; *Blacklock I*, 2014 WL 3731885, at *1. The Kansas Supreme Court (KSC) denied Petitioner's petition for review in June 2015 and Petitioner did not file a petition for certiorari in the United States Supreme Court. (Doc. 1, p. 3.)

In June 2016, Petitioner filed in Johnson County District Court a motion seeking state habeas corpus relief under K.S.A. 60-1507. *See id.* The state district court denied the motion and Petitioner appealed. *Id.* The KCOA affirmed the denial and the KSC denied Petitioner's petition for review in November 2022. *Id.* at 3-4; *Blacklock v. State*, 2021 WL 5991884, *1 (Kan. Ct. App. Dec. 17, 2021) (unpublished) (*Blacklock II*), *rev. denied* Nov. 23, 2022. In November 2023, Petitioner filed in this Court a pro se petition for federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1, p. 14.)

Rule 4 of the Rules Governing § 2254 Cases requires this Court to review a habeas petition upon filing and to dismiss it "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." Rules Governing § 2254 Cases, Rule 4, 28 U.S.C.A. foll. § 2254. Because Petitioner is proceeding pro se, the Court liberally construes his

filings. *See Hall v. Bellman*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the Court does not assume the role of Petitioner's advocate and it will not construct arguments for him. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

This action is subject to the one-year limitation period established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in 28 U.S.C. § 2244(d). The Rule 4 review of the petition revealed that it appeared to be untimely filed, so this Court issued a notice and order to show cause (NOSC) setting out the relevant law and explaining its conclusion that the last day to timely file this petition was March 16, 2023. (Doc. 3, p. 3-5.) Because Petitioner did not file it until November 15, 2023, the petition is untimely. *Id.* The NOSC further noted, however, that equitable tolling of the statute of limitations is sometimes available and that actual innocence may provide an exception to the statute of limitations. *Id.* at 5-6. To obtain the actual innocence exception, the NOSC explained, Petitioner must identify new reliable evidence not presented at trial that, had it been presented, would make it more likely than not that a reasonable juror would not have found him guilty beyond a reasonable doubt. *See House v. Bell*, 547 U.S. 518, 536-37 (2006); *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). The NOSC granted Petitioner time to show cause why this matter should not be dismissed as time-barred. (Doc. 3, p. 6-7.)

On January 25, 2024, Petitioner timely filed a 178-page response, large portions of which were duplicative of documents already filed in this case. (Doc. 4.) Nevertheless, the Court carefully reviewed and liberally construed the response, which in part reasserted the actual innocence exception to the federal habeas statute of limitations.[1]  Liberally construing the response, the Court found that Petitioner identified the following as the new reliable evidence showing his actual innocence: "(1) portions of state-court transcripts; (2) caselaw; (3) an argument that the Kansas

---

[1] Petitioner also argued in the response that he had timely filed the petition, but the Court has already rejected that argument (Doc. 5, p. 3-4) and it is not discussed further in this order.

courts lacked jurisdiction and that two of his convictions were not supported by sufficient evidence; (4) an affidavit completed by Petitioner; (5) evidence of Williams' criminal history; and (6) statements from Ronrico Nesbitt." (*See* Doc. 5, p. 5.)

On January 31, 2024, the Court issued a memorandum and order (M&O) that analyzed Petitioner's arguments about the actual innocence exception and concluded that that the only evidence Petitioner identified that could potentially support such a claim was Williams' prior conviction of aggravated assault with a firearm and the statements by Nesbitt. *Id.* at 5-10. The evidence of Williams' prior conviction is a probable cause affidavit and a related Texas state court judgment. (Doc. 4, p. 150-51.) The probable cause affidavit, from a peace officer with the Houston, Texas police department, states that a reliable person told the peace officer that on January 9, 2000, Williams shot another individual "numerous times in the chest and abdomen" with a small caliber handgun Williams pulled from his pocket. *Id.* at 150. The victim also positively identified Williams to the peace officer as the man who shot him. *Id.* The judgment reflects that Williams was convicted of aggravated assault with a deadly weapon based on that incident. *Id.* at 151.

The evidence of Nesbitt's statements consists of two items. First, there is a signed but unnotarized "affidavit" from Nesbitt, dated July 31, 2017, that states:

> At the time I was in the County Jail (Johnson County) in 2011. I was in the same pod with Curtis. An[d] he told me the story about him and Blacklock. That the[y] drove to I[owa] to drop off drugs. An[d] was [supposed] to leave Blacklock somewhere (him not telling me) Blacklock's attorney never contacted me in any type of way. Curtis told me he was in the car either in front or behind an[d] that the guy who died was basically bull[y]ing Blacklock I don't know exactly when an[d] Blacklock was a [guinea] pig.

(Doc. 4, p. 155 (all errors in original).)

Second, there is a statement from Barbara Baker, dated December 23, 2016 and notarized on January 6, 2017, that states, in relevant part:

4

I volunteered to assist Christopher Blacklock in gathering information concerning his case while he was preparing his motion. I was looking for Ronreco Nesbitt to follow up with a conversation he had with Chris in Johnson County jail.

On January 18th 2016, mid afternoon I was able to have a telephone conversation with Ronreco Nesbitt. I explained the reason for my call and that I was looking for the statement that he was willing to provide Chris concerning a conversation that Ronreco was part of while playing cards. Ronreco told me that he was playing cards with what I assumed at first was "Z" and his boys but was actually Z's boys, Z being [illegible] what he told me but Ziahdrick. He didn't mention names of people playing cards, he told me that the conversation was about Chris being on a trip with the guys and that Chris was not supposed to come back from the trip alive. He was telling me how he didn't think it was right for Chris to be charged with murder when they would have killed him. I did not memorize the conversation with Ronreco because he told me that he would gladly write a statement stating exactly what he had told me but with more detail. I assumed that my conversation with him was only to provide him with an address and name to send his statement to. He did tell me that he would do anything to help Chris because he was protecting himself. I have put these phrases in my words because he said things such as "the dude did what he had to man", I do not know exactly how it was phrased to me. He said that Chris was not supposed to make it home. He also said he didn't think it was right for Chris to be in jail when he was innocent and that was why he wanted to help.

(Doc. 4, p. 153-54 (all errors in original).) The rest of the statement details Baker's efforts to help

Nesbitt provide a notarized statement and Baker's impressions of whether Nesbitt was being

honest. *Id.*

Because timeliness is an affirmative defense a federal habeas respondent may choose to

not assert, the Court in the M&O directed Respondent to file a limited pre-answer response (PAR)

that either (1) presents argument related to whether this matter was timely filed and whether Petitioner is entitled to the actual innocence exception based on Williams' criminal history and/or Nesbitt's statements, or (2) advises that Respondent relinquishes or declines to assert the affirmative defense of timeliness. If Respondent chooses to assert the affirmative defense of timeliness, Respondent shall cause to be forwarded to this Court for examination and review the records and transcripts, if available, of the criminal proceedings complained of by Petitioner.

(Doc. 5, p. 11.)

Respondent filed his PAR on June 4, 2024, asserting that Petitioner had not shown that he

should receive the benefit of the actual innocence exception. (Doc. 12) Respondent completed

submission of the required state-court records on July 12, 2024. (Docs. 13-19). The Court then

issued a second M&O granting Petitioner time to file a reply to the PAR if he wished to do so.

(Doc. 20.) Petitioner timely filed his reply on July 24, 2024. (Doc. 21.) The Court has reviewed

the extensive record now before it, as well as the parties' arguments regarding the actual innocence

exception to the federal habeas statute of limitations and the relevant law, and will now rule on the

issue.

**Analysis**

As stated in the Court's previous orders, Petitioner is not required to conclusively exonerate

himself to obtain the benefit of the actual innocence exception to the federal habeas statute of

limitations. *See Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021). Rather, he must identify

"new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence—that was not presented at trial." *See Schlup*, 513 U.S. at

324. He "must establish that, in light of [this] new evidence, 'it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S.

at 536-37 (quoting *Schlup*, 513 U.S. at 327). To determine whether Petitioner has made a

sufficiently credible showing of actual innocence to overcome the untimeliness of his petition, this

Court

> must consider all the evidence, old and new, incriminating and exculpatory, without
> regard to whether it would necessarily be admitted under rules of admissibility that
> would govern at trial. Put another way, the innocence inquiry requires a holistic
> judgment about all the evidence[] and its likely effect on reasonable jurors applying
> the reasonable-doubt standard.

*See Fontenot*, 4 F.4th at 1031-32 (citations and internal quotation marks omitted).

The actual innocence standard is demanding and is not easy to meet. Only an extraordinary

case—in which there is "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error"—will justify application of the actual innocence exception. *Id.* at 1031 (citations and internal quotation marks omitted). "This exception 'is intended for those rare situations where the State has convicted the wrong person of the crime or where it is evident that the law has made a mistake.'" *Taylor v.* Powell, 7 F.4th 920, 926-27 (10th Cir. 2021) (citations omitted). It exists "to ensure that [a] petitioner's case is truly extraordinary while still providing [a] petitioner a meaningful avenue by which to avoid a manifest injustice." *Fontenot*, 4 F.4th at 1031 (citations and internal quotation marks omitted).

As a threshold matter, Respondent urges the Court to deny Petitioner the benefit of the actual innocence exception because Petitioner is arguing "legal innocence" not "factual innocence." (Doc. 12, p. 20-21.) At trial, Petitioner argued self-defense and the jury was instructed on self-defense. (Doc. 15-1, p. 44-45 (jury instructions); Doc. 15-13, p. 143 (opening argument by the defense includes the statement "This trial is a case of self-defense."); Doc. 15-16, p. 156-58 (State's closing argument discussing self-defense), 160-64 (defense closing argument related to self-defense), 165 (State's rebuttal argument referring to self-defense). He now argues to this Court that if the jury had been aware of Williams' prior conviction and Nesbitt's later statements, any reasonable juror would have found he acted in self-defense and would not have found, beyond a reasonable doubt, that Petitioner was guilty of second-degree murder.

As this Court noted in the M&O directing the PAR, the Tenth Circuit in *Pacheco v. Habti*, 62 F.4th 1233, 1243 n.8 (10th Cir. 2023), explained that its precedent should not be read to hold "that affirmative defenses go only to legal innocence and cannot establish actual innocence." (Doc. 5, p. 9.) Despite acknowledging this portion of *Pacheco*, Respondent nevertheless asserts in his

PAR that "*Pacheco* was incorrect about self[-]defense"; in support, he directs the Court to caselaw from the Sixth Circuit, as collected by the United States District Court for the Western District of Michigan. (Doc. 12, p. 20-21.) It is well established that this Court is bound by Tenth Circuit precedent. *See United States v. Spedalieri*, 910 F.2d 707, 709, n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits. [Citations omitted.]"). Thus, *Pacheco* is binding on this Court and Respondent's arguments against it are unpersuasive. This Court will consider whether Petitioner has made a credible showing of actual innocence based on the evidence of Williams' prior conviction and Nesbitt's statements.[2]

To be clear, the only question currently before this Court is whether Petitioner has met the standard to qualify for the actual innocence exception to the federal habeas statute of limitations. Petitioner notes in his reply that the PAR does not respond to some of his arguments about alleged constitutional violations in his state criminal proceeding. (*See, e.g.*, Doc. 21, p. 2 (noting that the PAR did not address the prosecutor "withholding the victim[']s prior arrests and convictions).) The focus of the PAR—as established by the Court in its M&O—is whether Petitioner has made the showing of actual innocence required to overcome the untimely filing of his petition in this matter. Only if Petitioner receives the benefit of the actual innocence exception will the Court order Respondent to substantively answer Petitioner's allegations that his state-court conviction was constitutionally invalid. *See Taylor*, 7 F.4th at 926 (explaining that a successful actual innocence claim serves as a "gateway" through which a petitioner can then bring procedurally barred claims that a state conviction was unconstitutional).

---

[2] The Court has already rejected Petitioner's arguments that portions of state-court transcripts, a lack of jurisdiction, insufficient evidence to support the convictions, or an affidavit from Petitioner asserting that the prosecutor at his criminal trial was a member of the same gang as Williams and Curtis is new reliable evidence by which Petitioner can show his actual innocence. (*See* Doc. 5, 5-11.) It sees no need to repeat that lengthy analysis here.

As noted above, a state jury convicted Petitioner of second-degree murder, possession of marijuana with intent to distribute, and possession of drug paraphernalia. (Doc. 1, p. 1.) Liberally construing the pro se filings from Petitioner, his current actual innocence argument is directed at his second-degree murder conviction.[3] The first question before the Court is whether the evidence on which Petitioner bases his claim to the actual innocence reception is new and reliable. To determine whether the evidence is new, the Court simply asks whether it was considered by the jury at Petitioner's trial. If it was not, it is new. *See Taylor*, 7 F.4th at 927 (defining "new" as "not considered by the fact-finder in the original proceedings"). To determine whether the evidence is reliable requires a more nuanced analysis. As explained in the M&O previously issued in this case, when determining the reliability of evidence in this context, courts may consider whether a document is sworn to under oath and whether it is notarized and may also make independent credibility determinations. (Doc. 5, p. 8); S*ee also Scott v. Bridges*, 2023 WL 5016642, *11 (E.D. Okla. Aug. 7, 2023) (unpublished opinion and order) (finding unreliable an unsworn letter from the petitioner's son and documents referred to but not presented to the court).

To his credit, Respondent candidly concedes that the evidence of Williams' conviction for aggravated assault is both new and reliable. (Doc. 12, p. 14-15); The Court will discuss the probable impact of this evidence on a reasonable juror below. Respondent also concedes that Nesbitt's and Baker's written statements are new evidence. *Id.* at 14. Unlike the prior conviction, however, Respondent argues that this evidence of Nesbitt's statements is not reliable. (Doc. 12, p. 15-17.) He asserts that the timing of Nesbitt's statements "is suspect," he points out that Nesbitt

---

[3] Petitioner discusses his belief that there is "new reliable evidence not presented at trial" that undermines his drug-related convictions. (*See, e.g.*, Doc. 4, p. 21 ("Petitioner was not part of any drug transaction. Petitioner was a passenger at the time of his arrest. There was no drugs sold in Kansas and no drugs were found. Lack of jurisdiction, new reliable evidence not presented at trial. [*sic*]").) The Court has already rejected these arguments (Doc. 5, p. 5) and will not repeat that analysis here.

did not swear to his statements, and he contends that Nesbitt's statements are not consistent with the record. *Id.* at 15.

The statement written and signed by Nesbitt is not notarized, nor is it given under penalty of perjury. (Doc. 4, p. 155.) It asserts that Nesbitt's conversation with Curtis occurred "in 2011," but gives no more specific timeframe. After careful consideration, the Court determines that the written statement by Nesbitt is not reliable. It is merely an unsworn statement and, as this Court has already explained, the fact that a statement is unsworn and unnotarized weighs against its reliability.

In contrast, Baker's statement regarding her conversation with Nesbitt is notarized and includes her agreement to "give this statement under oath because it is a true and factual statement." Thus, it is more reliable than Nesbitt's written statement. That being said, Baker's statement is reliable only to the extent that it sets forth Baker's recollection of her conversation with Nesbitt. That reliability does not attach to the statements Nesbitt made during his conversation with Baker, nor does it attach to the unnamed individual[4] who told Nesbitt that Petitioner "was not supposed to come back from the trip alive." Although the Court is not currently concerned with whether Baker's statement would be admissible at a trial, an affidavit that consists only of hearsay[5] may be deemed less reliable than an affidavit containing statements from an eyewitness or someone with direct knowledge of the information. *See Fisher v. Pacheco*, 2022 WL 420480, *1 (10th Cir. Feb. 11, 2022) (unpublished) (rejecting actual innocence claim based on "newly discovered evidence that bolstered [the petitioner's] claim of self-defense" because "we are not persuaded that . . . conclusory hearsay descriptions of allegedly inconsistent . . . witness statements

[4] The individual was identified in Baker's statement only as one of Williams' "boys." (Doc. 4, p. 153.)
[5] The Twelfth Edition of Black's Law Dictionary defines "hearsay" as "testimony that is given by a witness who relates not what he or she knows personally, but what others have said, and that is therefore dependent on the credibility of someone other than the witness."

10

. . . can reasonably be characterized as reliable"). Because Baker's statement merely sets forth her recollection of a conversation with Nesbitt during which he related information told to him by another, unnamed individual, it is not reliable evidence that Williams was part of a plan to kill Petitioner on the trip.

In any event, even assuming solely for the sake of argument that both Nesbitt's written statement and Baker's written statement were reliable evidence, the Court is not persuaded that Petitioner has met his burden to state a credible claim of actual innocence. Remember, in order to benefit from the actual innocence exception, Petitioner must convince this Court that, in light of Williams' prior conviction, Nesbitt's statement, and Baker's statement, it is "'more likely that not any reasonable juror would have reasonable doubt about Petitioner's guilt.'" *See Fontenot*, 4 F.4th at 1030 (citation omitted). This Court considers "all the evidence, old and new, incriminating and exculpatory, and thereby base[s] its probabilistic determination about what reasonable, properly instructed jurors would do on the total record." *Id.* at 1052 (internal quotation marks and citations omitted).

Liberally construing Petitioner's arguments, he contends that if the jury had seen Williams' prior conviction for aggravated assault with a handgun, the jury would have better realized Williams' capacity for violence and Williams' "character of aggressiveness," and would have found Petitioner's belief that stabbing Williams was necessary to protect his own life credible and reasonable. Similarly, Petitioner asserts that if the jury had heard Nesbitt testify that Curtis told him that they were supposed "to leave Blacklock somewhere" or heard Nesbitt testify about the experience and statements he later related to Baker, it would have been more likely than not that the jury would have fully accepted his self-defense theory and no reasonable juror would have convicted him of second-degree murder. (Doc. 4, p. 140-43, 150-51.)

This Court must consider what "reasonable, properly instructed jurors" would do when presented with all the evidence,[6] including the new evidence offered by Petitioner. The self-defense jury instruction given at Petitioner's trial explained:

> The defendant claims his use of force was permitted as self-defense.
>
> The defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and existence of facts that would persuade a reasonable person to that belief.
>
> When use of force is permitted as self-defense, there is no requirement to retreat.
>
> Self defense requires an imminently dangerous situation at the time of the killing. Imminent describes a broader time frame than immediate but the term imminent is not without limit. The danger must be near at hand. No one can attack and kill another because he may fear injury at some future time. There must be a showing of imminent threat or confrontational circumstance involving an overt act by aggressor.

(Doc. 15-1, p. 45.)

Two portions of this instruction particularly inform the Court's analysis in this matter. First, the final sentence of the second paragraph instructs that "[r]easonable belief requires both a belief by [the] defendant and existence of facts that would persuade a reasonable person to that belief." *Id.* Simply put, Petitioner was not aware at the time he killed Williams that Williams had a prior conviction for aggravated assault with a firearm.[7] And the statements to which Nesbitt apparently

---

[6] Although the Court sees no need to detail here all of the evidence and information it has considered in conducting this analysis, the parties are assured that the Court has carefully reviewed all of the more than 3,500 pages of documents and all of the video and audio recordings submitted. (*See* Docs. 4, 13, 13-1 through 13-42, 15, 15-1 through 15-20, 17, 17-1, 17-2, and 18.)

[7] At an evidentiary hearing in state district court in January 2019, the State's attorney asked Petitioner, "At the time of the murder, did you know that [Williams] had the aggravated assault conviction on his criminal history?" Petitioner responded, "He told me that he did a decade in prison and he just got out. So I did know that he was convicted of a crime. I did not know that it was aggravated battery, but although, he was discussing murdering people previously that night . . . ." (Doc. 13-4, p. 1, 110.)

would have testified did not occur until after Petitioner killed Williams. Thus, neither Williams'

conviction nor Nesbitt's statements could have informed Petitioner's subjective state of mind at

the time he killed Williams. Similarly, they would not assist in determining whether a reasonable

person in Petitioner's position objectively would have felt it necessary to kill Williams. *See State*

*v. Williams*, 303 Kan. 585, 594 (2016) (holding a victim's prior bad act is not relevant to a claim

of self-defense unless there is "a nexus between the alleged prior bad act of the victim . . . and the

defendant's state of mind at the time the defendant claims to have acted in self-defense").

Second, the final paragraph of the jury instruction informed the jury that "Self[-]defense

requires an imminently dangerous situation at the time of the killing." It further explained that

"[t]he danger must be near at hand. No one can attack and kill another because he may fear injury

at some future time. There must be a showing of imminent threat or confrontational circumstance

involving an overt act by [the] aggressor."

In the record now before the Court, there is evidence that Petitioner reported seeing the

outline of a pistol in Williams' left-side cargo pocket during the trip. (Doc. 15-15, 63-64.) He

further testified that he believed Curtis and Williams would kill him the next time their vehicle

caravan stopped. Petitioner testified that he saw Curtis switch lanes, moving out of the fast lane of

traffic, and he concluded that Curtis was about to take an exit off the highway. He then saw

Williams reach toward his left pocket. Petitioner's family flashed into his mind and he stabbed

Williams. *Id.* at 78-80. On the other hand, the record includes a statement from Petitioner telling a

detective that no one on the trip had a gun. There is evidence that when Petitioner killed Williams,

Williams was driving at highway speed and Curtis was in a separate car far enough ahead on the

road that he did not see Williams and Petitioner's vehicle crash. Finally, there are statements by

Petitioner that could be interpreted to support the conclusion that perhaps a fear of imminent

danger was not the motivating factor for Petitioner killing Williams.[8] Due to this conflicting evidence and the fact that neither Williams' prior conviction nor Nesbitt's statements affect whether Petitioner reasonably perceived that he was in imminent danger at the time, this Court cannot find it more likely than not that no reasonable juror would have convicted of second-degree murder. Put another way, this Court cannot conclude that it is more likely than not a reasonable juror would have concluded that Petitioner stabbing Williams was a permissible use of force in self-defense.

Based on a holistic review of all of the evidence, this Court finds that Petitioner has not made a credible showing of his actual innocence. The Court is not persuaded that, in light of Williams' prior conviction of aggravated assault and Nesbitt's statements, in addition to all the rest of the evidence, it is more likely than not that a reasonable, properly instructed juror would have reasonable doubt about Petitioner's guilt or would have been persuaded that Petitioner acted in permissible self-defense. Accordingly, the actual innocence exception to the federal habeas statute of limitations does not apply and this matter must be dismissed as time-barred.

## Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "the district court must issue or deny a certificate of appealability [(COA)] when it enters a final order adverse to the applicant." The Tenth Circuit has held that this requirement also applies to petitions brought under 28 U.S.C. § 2241. *See Montez v. McKinna*, 208 F.3d 862, 869 (10th Cir. 2000).

---

[8] Petitioner asked a detective whether the detective had told Eakin "that [Petitioner] killed that dude because he thought that, uh, old boy killed you because you wouldn't answer your phone." Later, Petitioner told the detective, "What I did is, [Williams] was nodding off on the road, um, trying to go to sleep on the road, so I put him to sleep on the road." At other times in the interview, Petitioner stated that he killed Williams because (1) "I thought old boy killed my friend"; (2) "I just flipped out, man, that's all there is to it"; and (3) "I thought, 'They want all this money, well, they gonna get it.'" Finally, when the detective asked why Petitioner had chased Williams down the highway after the crash, Petitioner replied, "[Be]cause he killed my—I thought he was going to kill me."

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The failure to satisfy either prong requires the denial of a COA. *Id.* at 485. The Court concludes that its procedural rulings in this matter are not subject to debate among jurists of reason. Therefore, the Court declines to issue a certificate of appealability.

**IT IS THEREFORE ORDERED THAT** this matter is dismissed with prejudice as time-barred. No certificate of appealability will issue.

**IT IS SO ORDERED.**

DATED:   This 15th day of August, 2024, at Kansas City, Kansas.

S/ John W. Lungstrum
JOHN W. LUNGSTRUM
United States District Judge